# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-31353

United States Court of Appeals
Fifth Circuit

**FILED**

October 26, 2015

Lyle W. Cayce
Clerk

ROBERT NAMER, doing business as Voice of America,

Plaintiff - Appellant

v.

BROADCASTING BOARD OF GOVERNORS; VOICE OF AMERICA,

Defendants - Appellees

Appeal from the United States District Court
For the Eastern District of Louisiana
USDC No. 2:12-CV-2232

Before BENAVIDES, DENNIS, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:*

Since its first transmission in Germany in 1942, the Voice of America (VOA) has served as the official news outlet of the United States government in foreign lands during wars both hot and cold. Among other historic events, it broadcast the "I Have a Dream" speech and Neil Armstrong's walk on the moon. Once operated as just a radio broadcast, VOA is now a multimedia organization reaching people through shortwave and FM radio, television,

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-31353

and—not surprisingly in today's world—two websites, insidevoa.com and voanews.com. Defendant Broadcasting Board of Governors ("the Board") is the agency that operates VOA. It registered a trademark for "Voice of America" in 2005.

Plaintiff Robert Namer has also been using the name "Voice of America" for years. He first used it as the name of his radio program and more recently has operated the website thevoiceofamerica.com. He filed this lawsuit against the Board seeking a declaratory judgment that he had the right to use the name "Voice of America," despite the Board's registered trademark. The district court rejected that claim and instead ruled in favor of the Board on its counterclaim for trademark infringement. That ruling resulted in an injunction preventing Namer from using the website.

Namer raises a host of issues on appeal, but we can consider only the two that he raised below: (1) a laches defense based on the Board's delay in bringing an infringement claim, and (2) the reliability of the consumer survey the Board used to establish a likelihood of confusion. Finding no error in the district court's treatment of these issues, we AFFIRM.

I.

Namer began using the name "Voice of America" in 1968 in seminars, lectures, print, radio shows, and television broadcasts. He incorporated "Voice of America, Inc." in Louisiana in 1977. Namer says he chose this name because he felt that "someone had to voice their opinion about the things and the news and the politics going on in our country" and he "chose to be that person." In 1991, he began hosting a radio program he called "Voice of America." Seven years later, during the dot-com boom, Namer purchased the domain name thevoiceofamerica.com.

As for the Board, despite the long history of the government-run Voice of America, it did not file an application to trademark "Voice of America" until

No. 14-31353

2005.  Prior to that, in 2000, the Board sent a letter to Namer stating that it had the exclusive legal right to use the name "Voice of America" and demanding that Namer stop using the name in his radio program.  The letter made no mention of the website.  Namer asserts that he orally informed the Board about the domain name thevoiceofamerica.com at that time, but the Board disputes this.  The parties had no further interaction until 2011, when the Board sent a cease-and-desist letter to Namer notifying him that it had registered the "Voice of America" mark.  Namer refused to stop using the name and refused to accept the Board's proposal that he instead use the domain name namersvoiceofamerica.com.  The Board next filed a complaint with the National Arbitration Forum, under the Uniform Domain Name Dispute Resolution Policy, seeking transfer of the domain name thevoiceofamerica.com.  The arbitrator ordered the transfer of the domain name to the Board.

Namer then filed this suit.  The district court granted summary judgment to the Board on its infringement counterclaim, finding that the Board had established the elements of the claim as a matter of law and that Namer had not met his burden of establishing a laches defense.  The district court granted injunctive relief preventing Namer from further infringing the Board's "Voice of America" mark.

## II.

Namer's only challenge to the district court's ruling that the Board had proven infringement is his argument that the survey the Board relied on to establish confusion should have been excluded.  We review the admission or exclusion of expert testimony for abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143, (1997).  "The district court's ruling will not be disturbed on appeal unless it is manifestly erroneous." *United States v. Valencia*, 600 F.3d 389, 423 (5th Cir. 2010).

No. 14-31353

As part of its proof to establish a likelihood of confusion, the Board presented the testimony of Bruce Isaacson. Isaacson conducted a study using individuals who would likely visit Namer's website, the accused infringing product, as the "universe" of consumers relevant to the survey. Namer contends that the proper universe would be those individuals who would be visiting the Board's "Voice of America" websites. The difference is that the government-run "Voice of America" targets international audiences, whereas Namer's website is aimed at those living in the United States.[1]

The survey the Board relied on used the right sample of potential consumers. We have repeatedly explained that a survey estimating the likelihood of confusion resulting from an infringing mark should sample "those purchasers most likely to partake of the alleged infringer[']s goods or services." *Exxon Corp. v. Tex. Motor Exch. of Hous., Inc.*, 628 F.2d 500, 507 (5th Cir. 1980) (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980)). When Domino Sugar sued then-nascent Domino's Pizza for trademark infringement, we found Domino Sugar's survey to be deficient because it only contacted "women found at home during six daylight hours who identified themselves as the member of the household primarily responsible for grocery buying." *Amstar Corp.*, 615 F.2d at 264. These likely consumers of sugar were not the relevant sample; "young, single, male college students" likely to order pizza for delivery were.[2] *Id*. That the survey should focus on potential consumers of the infringing product flows logically from the infringement

---

[1] Namer refused to respond to discovery requests concerning the demographics of the viewers who visited his website on the grounds that it was not relevant. Isaacson therefore conducted a survey of a "cross-section of visitors reflecting a spectrum of knowledge or familiarity with the subject matter at issue" and "who would be likely to visit [Namer's] website."

[2] We would venture that today there are more male purchasers of sugar at the grocery store and more female college students ordering pizza than there were in 1980.

inquiry, which seeks to determine whether those viewing the mark of the alleged infringer would be confused. 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:159 (4th ed. 2015). There is no confusion to assess for viewers of the infringed product; those consumers are using the good or service of the actual trademark holder. It was thus appropriate for Isaacson to survey potential consumers of Namer's website to determine if they might be confused into believing they were viewing the website of the government-run VOA (and 19.1% of them were confused).

### III.

Namer's primary argument is that he is entitled to a laches defense. He contends that even if he was infringing the Board's registered trademark, the Board's delay in seeking legal action against him bars the infringement claim. A prima facie case of laches requires the alleged infringer to show: (1) delay in the senior user's asserting its trademark rights, (2) lack of excuse for the delay, and (3) undue prejudice to the alleged infringer caused by the delay. *Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 490 (5th Cir. 2008).[3] The district court found that Namer failed to establish the final requirement of prejudice. That ruling stands on even stronger footing in light of an intervening decision from our court. *Pennzoil-Quaker State Co. v. Miller Oil & Gas Operations*, 779 F.3d 290 (5th Cir. 2015).

---

[3] The Board argues that even if Namer could establish a laches defense, laches does not provide a defense to injunctive relief, which is all that it sought and obtained. Indeed, we have recognized that a "finding of laches alone ordinarily will not bar the plaintiff's request for injunctive relief." *Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 152 (5th Cir. 1985). The reason is that the right of the public not to be confused may outweigh any inequity caused by the trademark holder's delay in suing. 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 31:10 (4th ed. 2015). That public interest in preventing confusion seems especially strong with respect to Voice of America, which plays a role in the foreign policy of the United States. But we need not reach decide this in light of our conclusion that Namer has not established a prima facie case of laches.

No. 14-31353

*Pennzoil-Quaker State* emphasized that an assertion of "undue prejudice" based on economic loss requires a showing that the infringer was "making significant investment decisions or building the bulk of its business based on the reasonable assumption that it had permission to use the plaintiff's marks, and that such investment or capital would be lost if the defendant could no longer use the mark." *Id.* at 296. The court noted that an infringer may be able to show undue prejudice when he used the mark to "expand" his business, but that prejudice will rarely be shown when the infringer merely "used the infringing mark in commerce." *Id.* at 298.

Continued routine use of the website during the time when the Board allegedly sat on its rights is all that Namer has established. Even for that routine operation, Namer has not introduced any evidence showing the amount of money spent. And although he argues that "he continued to invest in the operation and expansion of the business," he produced no evidence to that effect. In fact, Namer refused to respond to discovery requests concerning income, revenue, or expenses related to his operation of the website, asserting that the requested information "had no bearing" on the case. The failure to respond to that discovery, or otherwise submit any evidence establishing his investment in the website, prevents Namer from establishing economic prejudice.

For the first time on appeal, Namer argues that the Board's delay in bringing an infringement claim prejudiced his litigation strategy. As that issue was not raised below, we will not consider it. *Celanese Corp. v. Martin K. Eby Const. Co.*, 620 F.3d 529, 531 (5th Cir. 2010).

IV.

The same problem that doomed his trial prejudice argument infects the other arguments Namer raises on appeal: (1) that the First Amendment limits

No. 14-31353

the application of the Lanham Act to his website under *Rogers v. Grimaldi,* 875 F.2d 994 (2d. Cir. 1989); (2) that the Board is acting contrary to its controlling statutes and thereby violating Namer's due process rights; and (3) that he has a "prior use" defense under 15 U.S.C. § 1115(b)(5). Because Namer did not sufficiently raise these arguments in the district court, we do not consider them.

The district court's judgment is AFFIRMED.